# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MING HUANG, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br>  vs.<br><br>SONUS NETWORKS, INC., RAYMOND P. DOLAN, AND MARK T. GREENQUIST,<br><br>      Defendants. | Civil Action No.: 16-cv-10657-GAO<br><br>CLASS ACTION<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Richard Sousa ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sonus Networks, Inc. ("Sonus" or the "Company"), Company press releases, media and reports about the Company, and interviews with former employees. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of Sonus during the period of October 23, 2014 and March 24, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class"). On behalf of himself and the Class, Lead Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who issued knowingly false statements during the Class Period.

2.      Knowingly false projections are actionable under the federal securities laws.

3.      Sonus provides communication solutions that allow businesses large and small to secure their communications infrastructures.  Sonus's early products were hardware-based.  As newer, cloud-based software solutions proliferated, however, Sonus fell behind its competitors.  In addition longer purchasing decision cycles exacerbated the Company's troubles, as revenue expected in a particular quarter was pushed into the future, and often reduced.

4.      In mid-2014, Sonus hired Michael Swade as its new vice president of worldwide sales, replacing, but not firing, the former head of worldwide sales.  Sonus immediately changed the way it forecasted revenue.  Where before the Company had included in its revenue forecast each salesperson's "commit number," a conservative estimate of total sales from that employee in a particular time period, rather than their "stretch number," an aspirational figure rarely reached, Swade now demanded that sales employees use "stretch numbers" as their minimum target.

5.      On October 23, 2014, Sonus, including those "stretch numbers" in its forecast, projected $74 million in income in the first quarter of 2015.  Defendants knew this figure was unattainable when they issued the forecast.  Customers had defined their budgets by October, 2014, at the latest, so company executives, who regularly accessed Salesforce, an online application, updated daily, recording the state of sales, potential sales, and leads, knew that the projection was not based on customer commitments, as they had complete visibility into those commitments.  Defendant CEO Raymond P. Dolan ("Dolan") himself met regularly with customers to renew contracts with large accounts, and had personal knowledge of customer commitments, and the

longer decision cycles as companies moved from hardware to software. Finally, senior sales personnel were informing their superiors in weekly meetings, relayed to Defendants Dolan and CFO Mark T. Greenquist ("Greenquist"), that the Company would not reach $74 million in revenue in the first quarter.

6.     On February 18, 2015, more than halfway through the first quarter of 2015, Sonus inexplicably reiterated its $74 million revenue forecast for the quarter. Defendants assured investors that they expected deals to close in the next five weeks, but that Sonus was "not dependent upon a single large deal in the quarter."

7.     As they reiterated the projection Defendants knew that the Company would fall materially short of the $74 million revenue forecast. Indeed, Defendants were aware that Sonus would fail to reach its revenue projection than when they issued the original projection in October of 2014. Defendants knew that customers had finalized their commitments months earlier, and that the unrealistic "stretch numbers" remained aspirational and largely unreachable, a fact that senior sales personnel and the Company's Saleforce software regularly communicated to Defendants. In addition, as the first quarter, 2015, was more than half over, those same senior sales employees continued to express that the Company would fail to achieve the stretch numbers it included in the revenue forecast.

8.     Sonus could not avoid the reckoning it put off on October 23, 2014, and February 18, 2015, when it issued, and then reiterated, its revenue forecast against all known evidence to the contrary. On March 24, 2015, Sonus was forced to reveal the dismal results of the first Quarter of 2015. The Company had missed its forecast by a massive amount, taking in only $50 million in revenue. It further emerged that Defendants lied in February about the deals they expected to close. Half of the enormous loss was due in fact due to four large deals, with the remaining $12

million attributed to unrealized mid-sized deals.

9.      The market reacted immediately to the $25 million revenue miss.  The price of Sonus' stock plummeted $4.46 per share, from $13.16 to $8.70 per share, a loss of over 33%, causing damage to investors.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.  Defendant Sonus maintains its headquarters and conducts business in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     Lead Plaintiff Richard Sousa, as set forth in the certification filed with his motion for appointment as lead plaintiff, purchased Sonus securities during the Class Period and has been damaged thereby.

15.     Defendant Sonus is organized under the laws of the Delaware and headquartered in

Westford, Massachusetts.  Sonus provides networked solutions from communications service providers and enterprises, bringing intelligence and security to real-time communications. The Company's common stock is listed on the NASDAQ, an efficient market, under the ticker symbol "SONS."

16.     Defendant Raymond P. Dolan ("Dolan") is, and was throughout the Class Period, Sonus' Chief Executive Officer ("CEO") and President.

17.     Defendant Mark Greenquist ("Greenquist") is, and was throughout the Class Period, Sonus' Chief Financial Officer ("CFO").

18.     The Defendants Dolan and Greenquist are collectively referred to herein as the "Individual Defendants."  Sonus and the Individual Defendants are referred to herein, collectively, as "Defendants."

19.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

20.     As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

21.     Sonus is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

22.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sonus under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Sonus' communication solutions allow service providers and enterprises to protect and secure their communications infrastructures by providing 4G/LTE solutions, including Voice over Internet Protocol ("VoIP"), video, instant messaging and online collaboration. Sonus' first products allowed these providers to reduce costs and increase security by switching from the costly Public Switched Telephone Network ("PSTN") infrastructures into the more efficient Internet Protocol ("IP") based models.

24.     As IP-to-IP communications have become more common, Sonus began shifting its product line to provide cloud-based solutions to link and secure multivendor, multiprotocol

communications systems and applications across their customers' networks of smartphones and tablets, for all of their employees and all of their offices. Sonus' product focus was on "session border controllers" ("SBCs"), which help secure connections as private communications connect with the public internet.

25.     The shift to IP-to-IP communications with the advent of wireless communications meant a switch to software-based products and solutions. Sonus has acknowledged this shift. In October 2013, Sonus introduced a software-based SBC designed with unlimited scalability and advanced features. The switch to 4G LTE networks created additional security risks and network congestion. Sonus' product focus has more recently shifted to diameter signaling controllers ("DSCs"), which interconnect separate elements and create a central point of control. DSCs are the fastest-growing segment of it business, though not the largest.

26.     Sonus' largest customer historically has been AT&T, which provided approximately 19% of its revenue in 2014, and over 10% of its revenue in 2014. Sonus sells its products through a global direct sales force, with additional sales support from regional channel partners throughout the world. In 2012, Sonus launched an expanded channel partner program, the "Sonus Partner Assure Program," to expand its coverage of the service provider and enterprise markets.

27.     The shift from hardware to software created indecision on the part of Sonus' customers, and hurt Sonus' business. A former employee ("FE1") who worked as an Inside Sales and Business Operations Representative in Sonus' Westford, Massachusetts headquarters from November 2007 to October 2014,[1] stated that as Sonus' competitors rolled out new cloud-based

---

[1] FE1 reported to Matt Dillon, Senior VP of Global Services. Dillon reported to CEO Richard Nottenburg, and later to Nottenburg's replacement, Defendant Dolan.

solutions, Sonus' hardware-based products were behind the times, and they lost customers. By late 2014, Sonus was losing customers "quarter after quarter."

28. Further, customers were shifting to longer decision cycles, according to FE1. During the Q2 2014 Earnings Conference Call on July 30, 2014, Defendant Dolan confirmed this, acknowledging that "a large order recently expected to score this year is now likely to score in 2015." Defendant CFO Greenquist elaborated on the longer cycles, stating with respect to the same delayed order that "it will be tough to say whether it's going to happen in a single quarter, next year or whether it's going to be multiple quarters." Magnifying Sonus' knowledge that sales cycles were longer, months later, during the Q3 2014 Earnings Conference Call on October 23, 2014, Dolan admitted that there was no certainty that the same order would even come in in 2015, stating "we still **think** that will happen in 2015, but not exactly sure in what quarter."

29. Sonus used a software program called "Salesforce" to track sales and update forecasts on a constant basis. According to a former employee ("FE2"),[2] an Enterprise Account Manager headquartered in Dallas, Texas, from May 2013 to January 2015, sales employees entered information into the system daily, including information concerning deals that were not going to close. Defendants Dolan and Greenquist had unfettered access to Salesforce data and reports. Another former employee ("FE3"), who was a Senior Director of Communications Channel in California from 2011 to 2013,[3] confirmed Dolan's and Greenquist's unfettered access to Salesforce database and reports. Yet another former employee ("FE4"), a Senior Channel Account Manager

---

[2] FE2 reported to FE6, VP of Enterprise for the Americas.

[3] FE3 reported to Joe McLaughlin, VP of Global Channels, who reported to Senior Vice President of Worldwide Sales Todd Abbott.

for Sonus Networks in Kansas from January 2013 to January 2015,[4] recalled that Enterprise employees were rigorous about updating daily prospects and active accounts into the Salesforce database.

30.     Indeed, FE3 recalls that Sonus sales personnel were in contact with larger customers on a daily basis.  FE2 recalls maintaining daily contact with the Sonus customers she serviced.

31.     According to FE1, Defendants Dolan was intimately involved in contract negotiations with Enterprise customers, regularly stepping in to help renew contracts with Enterprise accounts.  FE3 corroborated this, recalling that Defendant Dolan visited large, Enterprise customers such as AT&T, Verizon, and Level 3.  Indeed, FE2 recalls Defendant Dolan accompanying her to sales meetings with customers to assist in closing Enteprise deals.

32.     According to another former employee ("FE5"), a Proposal Manager in the Westford, Massachusetts company headquarters from December 2013 to March 2015, Defendants Dolan and Greenquist were intimately involved in monitoring Sonus sales and the details and progress thereof.

33.     FE1 recalls that Defendant Dolan led quarterly meetings where he discussed contract renewals and sales progress.  FE6, a former Sonus employee, who was the Vice President of Enterprise Sales in the Americas from December 2012 to December 2014, working from a Boston, Massachusetts office,[5] recalls that Sales Vice Presidents held a weekly meeting with the

---

[4] FE4 reported to Joe McLaughlin, VP of Global Channels.   McLaughlin reported to Vice President of Sales Todd Abbott.  After Abbott left Sonus in October 2014, McLaughlin reported to his replacement, Michael Swade.

[5] FE6 reported directly to Todd Abbott, Senior Vice President of Worldwide Sales.

Senior Vice President of Worldwide Sales, who, in turn, apprised Defendant Dolan of details of the discussion at every meeting.  According to FE3, the Vice President of Worldwide Sales and Defendant Dolan met at least once weekly.

34.   According to FE3, at the start of each year, Sonus compiled a revenue forecast. Each member of a sales team had to forecast their sales for the year.  Each sales member submitted two numbers – a "commit number," which management expected the employee to reach, and a higher "stretch number," considered a best case scenario, and unlikely to be reached.  Until the middle of 2014, Sonus based sales targets and revenue forecasts on the "commit numbers." According to FE3, sales personnel submitted weekly reports indicating whether they were on track to meet their "commit number."  FE3 states that Defendants Dolan and Greenquist had access to all of the information used to make projections, and that the Vice president of Worldwide Sales updated both Defendants Dolan and Greenquist at least once weekly in face-to-face meetings.  FE6 confirms the difference between commit numbers and stretch numbers and that Defendants Dolan and Greenquist received at least weekly updates about these numbers.

35.   FE3 recalls that customers, including large customers such as AT&T, Verizon, and Level 3, defined their budgets for the next year by October of the previous year, including a breakdown of the quarters in which the customer would order from and pay Sonus.  Customers did not typically spend beyond what they had budgeted by October.  According to FE3, if customers determined to alter their contracts materially or otherwise not to renew their contracts, Defendants Dolan and Greenquist knew that "months in advance of the first quarter," and "in the worst case it would be in October."  Sales personnel apprised management immediately, via email, as soon as a customer made a decision that might cause the salesperson not to reach his commit number. Indeed a former employee ("FE7"), who was Sonus's Regional Sales Director for the central

region, 2008 to 2013,[6] confirms that with respect to larger customers, given lengthy decision cycles, once sales personnel labeled a sale as a "committed numbers," rarely would that sale ultimately not occur.

36.     In July, 2014, however, Sonus replaced Todd Abbott as Vice President of Worldwide Sales, hiring Michael Swade to serve in that position.  FE6 recalls that Swade implemented an immediate change in the Company's policy regarding forecasting revenue.  With the knowledge of Defendants Dolan and Greenquist, Sonus began including sales personnel's "stretch numbers" in their forecasts instead of only the "commit numbers."  Swade pressured sales vice presidents and personnel to forecast unrealistic numbers, including in quarterly revenue forecasts leads that sales personnel did not expect to yield revenue in the short term, and to include leads and deals that were unlikely to close in the "commit numbers."  Swade told Sonus sales personnel to include more stretch numbers and commit numbers because what the sales personnel had forecast was not enough.  Sonus fired FE6, in December, 2014 – over a month after disclosing the first quarter, 2015, revenue forecast – for refusing to include in FE6's "commit number" sales that were not going to close in the quarter.  FE6 recalls, however, that other Sales Vice Presidents succumbed to the pressure and used their "stretch numbers" as their "commit numbers."

37.     FE6 recalls that during multiple weekly sales meetings in November and December of 2014, sales vice presidents raised concerns to Swade about whether Sonus would close a sale to AT&T, Sonus' largest customer.  As noted above, FE6 recalls that Swade apprised Dolan and Greenquist weekly of the discussions of every sales meeting.  FE5 confirms FE6's account, stating that during the weekly sales operations meetings during the fourth quarter of 2014 and the first

---

[6] FE7 reported directly to Todd Abbott, VP of Worldwide Sales.

quarter of 2015, sales personnel expressed that the Company would fail to achieve the "stretch numbers" it included in the first quarter, 2015, revenue forecast.

38.     Thus, before Defendants disclosed Sonus's October 23, 2014 revenue forecast, they had complete visibility into first quarter, 2015, revenues, as all customer commitments had been made.  Further, they knew that they deliberately included the sales team's stretch numbers in the forecast and not only their commit numbers as had been Sonus's practice prior to hiring Swade.  As these numbers included potential revenue to which customers had not committed, Defendants knew that the revenue forecast for the first quarter of 2015 was materially inflated.

39.     Further, before Defendants publically reiterated the first quarter, 2015, revenue forecast on February 18, 2015, Sonus knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that Sonus would achieve the first quarter sales forecast.  Specifically, in weekly meetings in January and early February, 2015, the Sonus sales team expressed the specific concern that they could not confirm that AT&T, Sonus' largest customer, would purchase during the first quarter of 2015.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

40.     On October 23, 2014, during the Q3 2014 Earnings Conference Call, Sonus issued a projected revenue forecast for Q1 of 2015.  Defendant Greenquist stated: "we are also comfortable with the current consensus estimates for the first quarter of next year of $74 million in revenue and a penny of non-GAAP EPS."

41.     The first quarter, 2015, revenue forecast in the preceding paragraph was materially false and misleading because Defendants knew the following:

(a)     Sonus had complete visibility into its first quarter, 2015, revenues prior to the October 23, 2014 forecast because all customer commitments for first quarter 2015

were finalized by October, at the latest.  Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Defendants knowingly included "stretch numbers" as "commit numbers" in Sonus's first quarter, 2015, revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts.  Sales personnel informed Sonus that the "stretch numbers" were not attainable.  Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

(c)     Defendants Dolan and Greenquist monitored closely sales at the Company. Sonus used Salesforce, insisting that its sales personnel diligently update the database, enabling Defendants to track sales and update forecasts.  Defendants regularly accessed this database.

(d)     Sales Vice President Swade updated Defendants at least weekly on the discussions at sales meetings, during which senior sales personnel stated that Sonus would fail to achieve the first quarter, 2015, revenue forecast.  More, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

(e)     As such, Defendants knew that Sonus would not achieve its first quarter, 2015, revenue forecast, at the time Defendants disclosed it.

42.     On February 18, 2015, the Company issued a press release announcing its financial results for the fourth quarter of 2014, which was filed as an exhibit to a Form 8-K filed with the

SEC. In the press release, issued a mere five weeks prior to the close of Q1 of 2015, the Company reiterated its previous revenue forecast for Q1 of 2015 of $74.

43.     Also on February 18, 2015, the Company held an Earnings Conference Call to discuss the financial results for the fourth quarter of 2014. During this conference call, Defendant Greenquist reiterated the Company's revenue guidance for the first quarter of 2015, stating "Now, looking at Q1, we expect revenue to be approximately $74 million." Defendant Greenquist further stated during the call that "our first quarter is more backend loaded than the past few years but the revenue is also far more diversified. In short, we're not dependent upon a single large deal in the quarter. Instead, we have a number of good sized deals in our funnel that we expect to close over the next few weeks."

44.     Defendants' February 18, 2015 reiteration of Sonus's first quarter, 2015, revenue forecast was materially false and misleading because Defendants knew the following:

(a)     Sonus had complete visibility into its first quarter, 2015 revenues prior to the October 23, 2014 forecast because all customer commitments for the first quarter, 2015, were finalized by October, at the latest. Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the Q1 2015 revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts. Sales personnel informed Sonus that the "stretch numbers" were not attainable. Sales personnel that refused to submit "stretch numbers" as

"commit numbers" were fired.

      (c)      Defendants Dolan and Greenquist were "extraordinarily, extremely involved" in monitoring sales at the company. The Company used Salesforce, which was rigorously updated by Sonus' sales personnel, to track sales and update forecasts, and Defendants regularly accessed this database. Defendants were regularly updated on the discussions at sales meetings, in which senior sales personnel stated that the revenue forecast would not be reached.  Moreover, Defendant Dolan was intimately involved in contract negotiations with big accounts, regularly stepping in to help renew contracts with big accounts.

      (d)      Before Defendants reiterated the first quarter, 2015, revenue forecast on February 18, 2015, Sonus knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and expressed specific concern that they could not confirm that AT&T, Sonus' largest customer, would purchase during Q1 of 2015.  This information was reported to Defendants.

      (e)      During the April 22, 2015, Q1 2015 Earnings Conference Call, contrary to their statements on February 18, 2015, Defendants admitted that Sonus was dependent on large deals to reach their forecast during the first quarter of 2015.  Defendant Greenquist announced that $12 million of the $24 million shortfall was from the loss of large deals, from "four of our largest customers," with the other $12 million due to the failure to complete "a large number of mid-size deals."

45.      In addition, Defendants included or incorporated by reference certain risk disclosures, related to its revenue forecast for the first quarter of 2015.  For example, at the

Commencement of the October 23, 2015 Earnings Conference Call, Sonus vice president of investor relations, Patti Leahy stated:

> As shown on slide 2, please note that during this call, we will make forward-looking statements regarding items such as future market opportunities and the company's financial outlook. Actual events or financial results may differ materially from these forward-looking statements and are subject to various risks and uncertainties including without limitation, economic conditions, market acceptance of our products and services, the timing of revenue recognition, difficulties leveraging market opportunities, the impact of restructuring activities, and our ability to realize the benefits of acquisition.
>
> A discussion of these and other factors that may affect future results is contained in our most recent Form 10-Q filed with the SEC and in today's earnings release, both of which are available on our web site. While we may elect to update or revise forward-looking statements at some point, we specifically disclaim any obligation to do so.

46.     Similarly at the commencement of the February 18, 2015 Earnings Conference Call, Sonus vice president of investor relations stated:

> As shown on Slide 2, please note that during this call, we will make forward-looking statements regarding items such as future market opportunities and the company's financial outlook. Actual events or financial results may differ materially from these forward-looking statements and are subject to various risks and uncertainties including without limitation, economic conditions, market acceptance of our products and services, the timing of revenue recognition, difficulties leveraging market opportunities, the impact of restructuring activities and our ability to realize the benefits of acquisition.
>
> A discussion of these and other factors that may affect future results is contained in our most recent Form 10-Q filed with the SEC and in today's earnings release, both of which are available on our website. While we may elect to update or revise forward-looking statements at some point, we specifically disclaim any obligation to do so.

47.     In its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014, filed with the SEC on October 28, 2014, and in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014, filed with the SEC on July 31, 2014, the Company included the following relevant risk disclosures:

> ***Our quarterly revenue and operating results are unpredictable and may fluctuate significantly from quarter to quarter, which could adversely affect our business, consolidated financial statements and the trading price of our common stock.***
>
> Our revenues and operating results may vary significantly from quarter to quarter due to a number of factors, many of which are outside of our control and any of which may cause our stock price to fluctuate. The primary factors that may affect our revenues and operating results include, but are not limited to, the following:
>
> • consolidation within the telecommunications industry, including acquisitions of or by our customers;
>
> • general economic conditions in our markets, both domestic and international, as well as the level of discretionary IT spending;
>
> • competitive conditions in our markets, including the effects of new entrants, consolidation, technological innovation and substantial price discounting;
>
> • fluctuation in demand for our voice infrastructure products and services, and the timing and size of customer orders;
>
> • fluctuations in foreign exchange rates;
>
> • cancellation or deferral of existing customer orders or the renegotiation of existing contractual commitments;
>
> • mix of product configurations sold;
>
> • length and variability of the sales cycle for our products;
>
> • application of complex revenue recognition accounting rules to our customer arrangements;
>
> • timing of revenue recognition;

• changes in our pricing policies, the pricing policies of our competitors and the prices of the components of our products;

• market acceptance of new products, product enhancements and services that we offer;

• the quality and level of our execution of our business strategy and operating plan, and the effectiveness of our sales and marketing programs;

• new product announcements, introductions and enhancements by us or our competitors, which could result in deferrals of customer orders;

• our ability to develop, introduce, ship and successfully deliver new products and product enhancements that meet customer requirements in a timely manner;

• our reliance on contract manufacturers for the production and shipment of our hardware products;

• our or our contract manufacturers' ability to obtain sufficient supplies of sole or limited source components or materials;

• our ability to attain and maintain production volumes and quality levels for our products;

• variability and unpredictability in the rate of growth in the markets in which we compete;

• costs related to acquisitions; and

• corporate restructurings.

Equipment purchases by communications service providers and enterprises continue to be unpredictable given the current economic conditions. Additionally, as with other telecommunications product suppliers, we typically recognize a portion of our revenue in a given quarter from sales booked and shipped in the last weeks of that quarter. As a result, delays in customer orders may result in delays in shipments and recognition of revenue beyond the end of a given quarter. Additionally, it can be difficult for us to predict the timing of receipt of major customer orders, and we are unable to control timing decisions made by our customers. As a result, our quarterly

operating results are difficult to predict even in the near term and a delay in an anticipated sale past the end of a particular quarter may negatively impact our results of operations for that quarter, or in some cases, that year. Therefore, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance. If our revenue or operating results fall below the expectations of investors or securities analysts or below any guidance we may provide to the market, the price of our common stock could decline substantially. Such a stock price decline could also occur when we have met our publicly stated revenue and/or earnings guidance.

A significant portion of our operating expenses is fixed in the short term. If revenues for a particular quarter are below expectations, we may not be able to reduce costs and expenses proportionally for that quarter. Any such revenue shortfall would, therefore, have a significant effect on our operating results for that quarter.

48.     The foregoing risk disclosures were materially false and misleading, and, therefore, not meaningful, because Defendants knew but failed to disclose that:

(a)     Sonus had complete visibility into its first quarter, 2015 revenues prior to the October 23, 2014 forecast because all customer commitments for the first quarter, 2015, were finalized by October, at the latest.  Each of the major carriers that Sonus had contracts with, including AT&T, had lengthy decision cycles, a fact known by Sonus executives since at least 2014.

(b)     Sonus included sales personnel's "stretch numbers" as "commit numbers" in the first quarter, 2015, revenue projection. Defendants knew that these "stretch numbers" included potential revenue to which customers had not committed, that "stretch numbers" had never been included in revenue guidance, and that historically they were not reached, and had not been used in revenue forecasts.  Sales personnel informed Sonus that the "stretch numbers" were not attainable.  Sales personnel that refused to submit "stretch numbers" as "commit numbers" were fired.

19

(c)     Before Defendants reiterated the first quarter, 2015, revenue forecast on February 18, 2015, Sonus knew that senior sales personnel were expressing, in weekly meetings, that they did not believe that the Q1 sales forecast would be reached, that "sales weren't looking good," and expressed specific concern that they could not confirm that AT&T, Sonus' largest customer, would purchase during Q1 of 2015.  This information was reported to Defendants.

(d)     During the April 22, 2015, Q1 2015 Earnings Conference Call, contrary to their statements on February 18, 2015, Defendants admitted but failed to disclose in the risks related to its revenue forecast that Sonus was dependent on large deals to reach their forecast during the first quarter of 2015.  Defendant Greenquist announced that $12 million of the $24 million shortfall was from the loss of large deals, from "four of our largest customers," with the other $12 million due to the failure to complete "a large number of mid-size deals."

## THE TRUTH IS REVEALED

49.     On March 24, 2015, before the market opened, the Company issued a press release entitled "Sonus Updates Guidance and Initiates Cost Reduction Review."  The press release revealed the devastating Q1 2015 revenue shortfall.  Instead of the $74 million projection, the Company expected revenue of only $47-$50 million, and instead of a .03 cent gain in non-GAAP EPS, investors would now suffer a .29-.34 cent loss in non-GAAP EPS.

50.     The press release also announced that the Company would "initiate a company-wide review of its cost structure," *i.e.*, Sonus intended to fire a significant number of employees.

51.     The press release offered scant explanation for the $25 million miss, stating that "the Company no longer expects to receive certain orders this quarter that had been expected to be

received at the back end of the first quarter."

52.     On this news, shares of Sonus plummeted $4.46 per share, from $13.16 to $8.70 per share, a loss of over 33%, damaging investors.

53.     On April 22, 2015, during the first quarter, 2015, Earnings Conference Call, Defendants Dolan and Greenquist explained the reasons for the revenue forecast miss.  In doing so, they contradicted their own previous statements, ignored information of which they were aware, and stated as new information that which they knew as fact months earlier.

54.     Defendant Greenquist announced that $12 million of the $24 million shortfall was from the loss of large deals, from "four of our largest customers," with the other $12 million due to the failure to complete "a large number of mid-size deals.  This directly contradicted their statement of February 18, 2015, when, while ensuring investors that they were on track to close numerous deals, Defendant Dolan stated "we're not dependent upon a single large deal in the quarter."

55.     Defendants further expressed surprise that customers had "longer sales cycles," and blamed this phenomenon for part of the missed forecast.  Their "surprise" was disingenuous, since, as far back as July of 2014, defendants had acknowledged the shift to longer decision cycles while explaining the delayed 2014 deal that they then hoped would come to fruition in 2015.  Further, sales personnel were aware of longer decision cycles in 2014, and as the CEO and CFO had at least once-weekly meetings with the Vice President of Sales, they were also aware of the trend.

56.     Defendant Dolan feigned further "surprise" that "the vast majority of those late quarter deals [referenced in the February reiteration of the forecast] didn't occur."  Dolan noted that certain customers' Q1 purchases were "a fraction of what we forecast," completely ignoring the irresponsibility that went into the missed forecast, all of which can be laid at Sonus' feet.  It

was Sonus' arrogance that led it to substitute "stretch numbers" in place of "commit numbers" in formulating their forecast.  Defendants knew that "stretch numbers" were not reachable, their employees told them the numbers were unrealistic, they fired senior sales personnel who refused to go along with the switch, and thus Dolan and Greenquist knew for a fact that their forecast was false when they issued it on October 23, 2014, and reiterated it on February 18, 2015.

57.     Defendant Dolan also admitted that expected 2015 revenue from AT&T would be $35 million less than predicted -- $20 million instead of $55 million.  Neither Dolan nor Greenquist mentioned that their sales people had warned them before February 18, 2015 that they could not confirm that AT&T would commit to any purchases in Q1 of 2015.

58.     Dolan and Greenquist completely ignored the most obvious proof that they knew they would never achieve their revenue forecast, namely that before the first quarter, 2015, revenue forecast was reiterated on February 18, 2015, senior sales personnel were expressing, in weekly meetings, that they did not believe that the sales forecast would be reached, so Sonus had complete visibility in February of 2015 that its October, 2014 forecast for Q1 of 2015 would not be reached, and that any reiteration of that forecast would be false.

59.     Finally, the Sonus executives blamed their sales personnel for the missed projection, stating that since the announcement of the revenue miss, executives had "done a lot of work… in our interactions with customers," implying that they were not previously familiar with their customers' trends and expected purchases.  This implication was patently false.  Not only were Dolan and Greenquist "extraordinarily, extremely involved" in monitoring sales at the company well before the October revenue forecast, not only had those same sales personnel warned them that their projections were not reachable, not only had senior sales personnel expressed that they would not reach the $74 forecast in revenues, but Dolan himself regularly

22

visited with, and closed deals with, Sonus' customers well before the initial revenue forecast on October 23, 2014.

60.     During the conference call, Defendant Greenquist announced that Sonus would fire 12.5% of its workforce.

61.     Industry analysts reacted harshly to Sonus' announcement of its missed revenue target.  William Blair analyst Dmitri Netis, in a March 24, 2015 report, called "the magnitude of the miss shocking," and slammed Sonus' management, calling it "unresponsive.  He suggested that Sonus' management "skate to the penalty box."  William Blair lowered Sonus' stock rating from "Outperform" to "Market Perform."

62.     On March 25, analyst Cowen and Company expressed similar displeasure with Sonus' lack of forthrightness, expressing displeasure that "management provided no explanation for the reduced guidance."

## NO SAFE HARBOR

63.     Sonus' "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

64.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Sonus who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying

or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

65.     The market for Sonus securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Sonus securities traded at artificially inflated prices during the Class Period Plaintiff and other members of the Class purchased or otherwise acquired Sonus securities relying upon the integrity of the market price of Sonus securities and market information relating to Sonus, and have been damaged thereby.

66.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sonus securities and operated as a fraud or deceit on Class Period purchasers of Sonus securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Sonus securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Sonus securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

67.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Sonus' business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Sonus and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Sonus securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Sonus securities was removed and the price of Sonus securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

68.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Sonus securities during the Class Period that suffered compensable damages related to the securities violations alleged herein (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sonus securities and other publicly-traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes

that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sonus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sonus;

(c)     whether the Individual Defendants caused Sonus to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly in issuing false and misleading financial statements;

(e)     whether the prices of Sonus securities were artificially inflated during the

26

Class Period because of the conduct of Defendants complained of herein; and

        (f)     whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

      73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

      74.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

        (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

        (b)     The omissions and misrepresentations were material;

        (c)     Sonus' securities are traded in an efficient market;

        (d)     The Company traded on NASDAQ, and was covered by multiple analysts;

        (e)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

        (f)     Lead Plaintiff and other members of the Class purchased and/or sold Sonus securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

      75.    As a result of the foregoing, the market for Sonus' common stock promptly digested current information regarding Sonus from all publicly available sources and reflected such information in Sonus' stock price.  Under these circumstances, all purchasers of Sonus' common

stock during the Class Period suffered similar injury through their purchase of Sonus' common stock at artificially inflated prices, and a presumption of reliance applies.

76.     Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

77.     Alternatively, Lad Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972) as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**FIRST CLAIM**</u>
<u>**Violation of Section 10(b) of**</u>
<u>**The Exchange Act and Rule 10b-5**</u>
<u>**Promulgated Thereunder Against All Defendants**</u>

78.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.      Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and

a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Sonus securities during the Class Period.

81.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonus securities.  Lead Plaintiff and the Class would not have purchased Sonus securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

82.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of Sonus within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Sonus securities, the Individual Defendants had the power and authority to cause Sonus to engage in the wrongful conduct complained of herein. Sonus controlled the Individual Defendants and all of the Company's employees.

84.     By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: May 4, 2016                              Respectfully submitted,

**BLOCK & LEVITON LLP**

*/s/ Jeffrey C. Block*
Jeffrey C. Block (BBO # 600747)
Jason M. Leviton (BBO # 678331)
Jeff@blockesq.com
Jason@blockesq.com
155 Federal Street, Suite 400
Boston, Massachusetts 02110
(t) (617) 398-5600
(f) (617) 507-6020

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg
Gonen Haklay
jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
(t) (215) 600-2817
(f) (212) 202-3827

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey C. Block, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ <i>Jeffrey C. Block</i></u>
Jeffery C. Block
