UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10657-GAO

RICHARD SOUSA, individually and on behalf of all others similarly situated,
Plaintiff,

v.

SONUS NETWORKS, INC., RAYMOND P. DOLAN, and MARK T. GREENQUIST,
Defendants.

OPINION AND ORDER
June 6, 2017

O'TOOLE, D.J.

This putative class action alleges securities fraud by Sonus Networks, Inc. and two individual executives of the company, Raymond A. Dolan, Sonus's Chief Executive Officer, and Mark T. Greenquist, Sonus's Chief Financial Officer. In Count I of the First Amended Class Action Complaint (dkt. no. 42), the plaintiff[1] alleges violations by all defendants of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Exchange Act"), and related Rule 10b–5, 17 C.F.R. § 240.10b–5. Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by the individual defendants. The plaintiff contends that class members were harmed when they purchased Sonus's common stock at prices that were artificially inflated by the defendants' materially false and misleading statements concerning its revenue projection for the first quarter of 2015 ("Q1 2015").

---

[1] The current named lead plaintiff, Richard Sousa, was appointed in 2015 in the place of the original named plaintiff, Ming Huang, shortly before the action was transferred from the District of New Jersey to this Court.

The defendants have jointly moved to dismiss the Amended Complaint. For the reasons set forth herein, their motion to dismiss is GRANTED.

## I.   Factual Background[2]

The plaintiff alleges the following:

Sonus is a Massachusetts-headquartered company that provides hardware and software-based tools to help businesses secure their internet and communication infrastructures. As the industry has shifted toward wireless communications, Sonus has focused its business on software-based products.

Sonus has a sales force that sells its products directly to customers, and it also receives sales support from regional channel partners. Quarterly, Sonus prepares a revenue forecast, which relies on sales force members' projected sales. To formulate those projections, each sales force member forecasts both a "commit number," the sales goal expected to be reached for the relevant period, as well as a "stretch number," representing a best-case scenario. (First Am. Class Action Compl. ¶ 34 [hereinafter Am. Compl.].) There is no allegation concerning the quantitative distance between the "commit" and "stretch" projections.

Throughout the year, sales force members track their sales by means of an internal software program called Salesforce. The Amended Complaint alleges that, in general, sales employees have daily contact with customers and are rigorous about submitting updates to Salesforce to track their progress toward their sales targets.

---

[2] Unless otherwise noted, the factual allegations outlined here are set forth in the Amended Complaint and the documents incorporated by reference therein. The Amended Complaint includes allegations from seven former Sonus employees, who are referred to as "FE1" through "FE7." It appears that five of these individuals left Sonus before the class period, and the remaining two left in early 2015.

The Amended Complaint alleges three ways in which defendants Dolan and Greenquist kept abreast of Sonus's progress toward its revenue goal during the class period. First, they had access to Salesforce and in fact accessed it during the class period. Second, sales personnel provided regular progress reports to management, and the content of those reports was communicated to defendants Dolan and Greenquist on a weekly basis. Third, defendant Dolan at times took an active role in driving revenue by accompanying sales personnel to customer meetings, including large customers like AT&T, and by himself conducting contract negotiations.

In July 2014, Sonus hired a new Vice President of Worldwide Sales, Michael Swade. Swade implemented an "immediate change" to Sonus's revenue forecasting policy: Sonus began including more stretch numbers in the quarterly revenue forecasts.[3] (See Am. Compl. ¶ 36.) The Amended Complaint alleges that employees were pressured to submit their stretch numbers as commit numbers, and those who refused to do so, such as FE6, were fired.

The Amended Complaint alleges that Sonus made materially false and misleading statements at two points during the class period, first on October 23, 2014, and later on February 18, 2015.

A.    The October 23, 2014 Earnings Call

On October 23, 2014, the first day of the claimed class period, Sonus disclosed during an earnings call with analysts and investors its revenue forecast for Q1 2015. Defendant Greenquist stated: "[W]e are also comfortable with the current consensus estimates for the first quarter of next year of $74 million in revenue and a penny of non-GAAP EPS." (Am. Compl. ¶ 40.) The reference

---

[3] The Amended Complaint does not allege the percentage of the forecast that was based on stretch numbers versus commit numbers. Nor, as noted above, is there any specific allegation of the magnitude of any difference between stretch and commit projections. In any event, both numbers when made were projections as to potential future results, and not verifiable computations of actual results.

to "consensus estimates" can fairly be understood to be to estimates made by investment analysts external to Sonus.

The Amended Complaint alleges that this disclosure was materially false and misleading because all customer commitments for Q1 2015 had substantially been made at the time of the earnings call, so that the defendants then had "complete visibility into first quarter, 2015, revenues." (Id. ¶ 38.) Specifically, the Amended Complaint alleges that the defendants knew that large customers in the industry had moved toward longer decision cycles for their purchases, and thus had set their budgets for the coming year by October of the preceding year. Furthermore, it is alleged that the defendants, who were closely monitoring Sonus's sales, knew that Sonus would not be able to meet the stretch numbers included in the Q1 2015 revenue projection.

### B.    The February 18, 2015 Press Release and Earnings Call

On February 18, 2015, Sonus issued a press release, which was also attached as an exhibit to Sonus's SEC Form 8-K, which reiterated the previous Q1 2015 forecast. The same day, in an earnings call discussing the results for the fourth quarter of 2014 ("Q4 2014"), defendant Greenquist stated: "Now, looking at Q1, we expect revenue to be approximately $74 million." (Am. Compl. ¶ 43.) Greenquist further noted:

> [O]ur first quarter is more backend loaded than the past few years but the revenue is also far more diversified. In short, we're not dependent upon a single large deal in the quarter. Instead, we have a number of good sized deals in our funnel that we expect to close over the next few weeks.

(Id.)

The Amended Complaint alleges that these statements were materially false and misleading because, at various points during Q4 2014 and Q1 2015, sales personnel expressed doubts as to their ability to reach the stretch numbers included in the Q1 2015 revenue forecast. It further alleges that defendants Dolan and Greenquist knew that a big miss was imminent because they

accessed Salesforce regularly, received weekly updates from Swade, who passed along the misgivings of sales personnel, and because defendant Dolan was personally involved in closing deals with customers. It is also alleged that the defendants knew of doubts as to whether a large client, AT&T, would conclude a purchase during Q1 2015.

For substantially the same reasons, the Amended Complaint further alleges that cautionary risk disclosures made during the February call (as during the October call) were themselves materially misleading, and therefore not meaningful so as to preclude liability.[4]

C.    The Announcement of the Shortfall and Post-Class Period Statements

About five weeks after the February call, on March 24, 2015, the last day of the alleged class period, Sonus issued a press release that revealed a dramatic revenue shortfall for Q1 2015 compared to projections. Rather than the forecasted $74 million in revenue, Sonus actually took in only about $50 million. Upon announcement of the miss, Sonus shares dropped from $13.16 per share to $8.70 per share.

---

[4] These risk disclosure statements were made by Sonus's Vice President of Investor Relations, who at the beginning of both earnings calls stated:

> As shown on slide 2, please note that during this call, we will make forward-looking statements regarding items such as future market opportunities and the company's financial outlook. Actual events or financial results may differ materially from these forward-looking statements and are subject to various risks and uncertainties including without limitation, economic conditions, market acceptance of our products and services, the timing of revenue recognition, difficulties leveraging market opportunities, the impact of restructuring activities, and our ability to realize the benefits of acquisition.

> A discussion of these and other factors that may affect future results is contained in our most recent Form 10-Q filed with the SEC and in today's earnings release, both of which are available on our web site. While we may elect to update or revise forward-looking statements at some point, we specifically disclaim any obligation to do so.

(See id. ¶¶ 45, 46.)

During an April 22, 2015, earnings call, Sonus representatives explained that the failure to close deals from "four of our largest customers" led to a $12 million shortfall, with the remainder of the shortfall due to "a large number of mid-size deals" having failed to be closed during the quarter. (See Am. Compl. ¶ 54.) The Amended Complaint alleges that this statement contradicted the February representation that the Q1 2015 projection was not dependent on a single large deal. (See id. ¶¶ 43, 54.)

## II.    Discussion

### A.    Legal Standard

The defendants have moved to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"). For Rule 12(b)(6) purposes, in assessing the sufficiency of the Amended Complaint, the Court accepts all well-pled factual allegations as true. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In general, to survive a Rule 12(b)(6) motion, the supporting factual allegations must make each claim "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). However, to state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must adequately plead: (1) a material[5] misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 193 (1st Cir. 2005) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005) (internal quotation marks omitted)).

---

[5] A fact is considered material if a reasonable investor would regard the fact as "significantly alter[ing] the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (citations and internal quotation marks omitted).

In a securities case alleging fraud, the plaintiff must additionally satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and of the PSLRA. Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); accord Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015). The PSLRA also "imposes a rigorous pleading standard on allegations of scienter." Fire & Police Pension Ass'n of Colo., 778 F.3d at 240 (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (internal quotation marks omitted)). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

B.      Section 10(b) Claims

Evaluation of the defendants' motion requires analysis of the specific statements (or omissions) the plaintiff alleges to have been fraudulent under Section 10(b) and Rule 10b–5. See In re Bos. Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55 (D. Mass. 1998).

i.      The October Statement

The defendants argue that defendant Greenquist's October 2014 statement that management was "comfortable with" outside analysts' Q1 2015 revenue forecast for Sonus was not misleading because it was merely non-actionable corporate puffery. "[C]ourts routinely have declined to impose liability where company officers simply express their 'comfort' with analysts' estimates." Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 253 (D. Mass. 2001) (citing Colby v. Hologic, Inc., 817 F. Supp. 204, 212–13 (D. Mass. 1993)); see also Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1218 (1st Cir. 1996), superseded by statute 15 U.S.C. § 78u–4(b)(2),

*as recognized in* Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 772 (1st Cir. 2011).

The plaintiff counters that the statement is actionable in light of the Supreme Court's decision in Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, which found that an opinion statement may nevertheless be misleading to an ordinary investor if the speaker either did not in fact hold the stated opinion, or omitted material facts that, if known by investors, would lead them to doubt the reliability of the stated opinion.[6] 135 S. Ct. 1318, 1328–29 (2015). I conclude that the plaintiff has failed to sufficiently allege that Greenquist's "comfort statement" fits into either Omnicare exception.

First, the plaintiff has not adequately alleged that in October 2014 the defendants were not in fact "comfortable" with analysts' $74 million revenue estimate for Q1 2015, though they told the market otherwise.

The plaintiff cites FE3, a former Senior Director of Communications Channel employed by Sonus from 2011 to 2013, who stated that Sonus's customers set their quarter-by-quarter budgets for the coming year by October of the preceding year. The plaintiff also cites FE7, a Regional Sales Director employed by Sonus from 2008 to 2013, who stated that once a sales employee included a sale to a large customer in their "commit number," given large customers' lengthy decision cycles, rarely would such a sale fail to close. Therefore, the plaintiff alleges, the defendants must have known that the Q1 2015 projection was false at the time defendant Greenquist made his October 2014 "comfort statement."

---

[6] While Omnicare involved a claim under Section 11 of the Securities Act of 1933, the Supreme Court noted that its analysis was not unique to Section 11. Id. at 1330. I therefore assume that it applies to the claims made here.

The allegations of these former employees are not enough to meet the PSLRA's heightened pleading standard. Notably, the uncertainty alleged in the Amended Complaint as to the timing of an expected purchase by a large customer, AT&T, tends to bely the claim that the defendants had complete visibility into Q1 2015 as of October 2014. (See Am. Compl. ¶¶ 37, 39, 44(d), 48(c).) On the one hand, the Amended Complaint seems to suggest that revenue projections could be made on the basis of customer budgets firmly set by October; on the other hand, it seems to recognize that there could be contingencies, such as whether or when a sale to AT&T might be finalized, that could affect the certainty with which projections could be made. In this circumstance, a "must-have-known" inference is insufficiently supported by specific factual allegations.

In any event, without more detail, this allegation is too sweeping to support an inference that the defendants themselves were not in fact "comfortable" with analysts' Q1 2015 projection in October 2014, so as to make such a statement misleading. The projections referred to in the statement were, after all, not internal projections but rather the "current consensus estimates" of outside analysts, presumably formulated on publicly available data. It is of course possible that the defendants knew non-public information that would have made expression of comfort with those external projections misleading, but the Amended Complaint falls short of alleging the necessary specifics. For example, it fails to include any specifics as to how the defendants' projection was calculated, what stretch numbers were included, what the variance between commit and stretch numbers aggregated to, and so on.

The plaintiff also relies on former sales employees' statements, which were allegedly made known to the defendants, that they would fail to reach their stretch numbers included in the Q1 2015 forecast and that Sonus would therefore fail to achieve the Q1 2015 revenue forecast. But this again merely layers one generalized allegation upon another generalized allegation. Without

details as to the amount of stretch included in the forecast or how many sales employees reported they would fail to reach their stretch numbers, a fact finder could not draw a strong inference that the defendants' expressed "comfort" with the analysts' consensus was disingenuous and purposefully or recklessly misleading. It is important to remember that the projection was not about the quarter in which the October earnings call occurred, when failures to meet projected targets might be ongoing and therefore more or less measurable, but rather were projections about a future quarter. Projections by members of the sales force would be subject to the same endemic uncertainty about future events as projections by management.

The factual allegations of the Amended Complaint are insufficient to warrant invocation of the first Omnicare qualification on the opinion rule. The allegations are simply too vague to support a *strong* inference that the defendants knew that they would be unable to meet the expressed projections for Q1 2015 and thus knew that the opinion expressed in the October statement was false and fraudulent.

As to the second Omnicare qualification, the plaintiff has also failed to adequately allege that the defendants' October 2014 statement was misleading for omitting material facts about how the opinion was formed. As the Court in Omnicare recognized, "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because "opinions sometimes rest on a weighing of competing facts." 135 S. Ct. at 1329. Again, the Amended Complaint relies only on general allegations of what the defendants must have known about the data supporting (or not) the projections, and general allegations of this sort are not enough. See Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006); Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 266 (D. Mass. 2013). Especially when accompanied by

cautionary statements,[7] a summary expression of comfort with the analysts' forecast cannot, without specific factual allegations undercutting the genuineness of that opinion, reasonably support an inference of an intent to mislead.

The plaintiff's attempted reliance on the <u>Omnicare</u> qualifications is not persuasive, and the October statement expressing comfort with analysts' Q1 2015 revenue forecast is properly assessed as non-actionable corporate puffery.[8]

> ii.     *The February Statements*

The allegations in the Amended Complaint regarding the February statements, in which Sonus announced that it expected Q1 2015 revenue of approximately $74 million, rely in large part on the same facts alleged regarding the October statement. The plaintiff also points to FE6's firing in December 2014 (allegedly for refusing to include in her commit number sales that were not going to close in Q1 2015) as evidence that the defendants knew the Q1 2015 forecast to be incorrect as of the following February. The Amended Complaint additionally alleges that by February sales personnel were expressing concerns about whether the AT&T deal would in fact close in Q1 2015. With respect to these allegations, the Amended Complaint again most clearly falls short because of the insufficiency of any allegations of scienter.

"[A] plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or a 'high degree of recklessness.'" <u>ACA Fin.</u>, 512 F.3d at 58 (quoting <u>Aldridge v. A.T.</u>

---

[7] At the beginning of the earnings call in which the statement expressing comfort with consensus estimates was made, a Sonus representative identified risks and uncertainties, including "economic conditions, market acceptance of our products and services, *the timing of revenue recognition*, [and] difficulties leveraging market opportunities." (Am. Compl. ¶ 45 (emphasis added).)

[8] In the alternative, the defendants argue that the statement is protected by the PSLRA's safe harbor provision for forward-looking statements. <u>See</u> 15 U.S.C. § 78u–5. The plaintiff's argument in response fails for the reason discussed above—failure to adequately plead that "the maker of the statements had actual knowledge [they were] false or misleading." <u>Greebel</u>, 194 F.3d at 201 (citing 15 U.S.C. § 78u–5(c)(1)(B)).

Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). To do this, a "plaintiff may combine various facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity—to satisfy the scienter requirement." In re Cabletron Sys., Inc., 311 F.3d 11, 39 (1st Cir. 2002) (citations and quotations omitted).

The First Circuit has set out a non-exhaustive list of indicia often relied upon to support a strong inference of scienter. See Greebel, 194 F.3d at 196. Even taking a generous view of the Amended Complaint, at most three of the Greebel factors are relevant here: divergence between internal reports and external statements, closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, and disregard of the most current factual information before making statements.

While the presence of these factors "provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge," Shaw, 82 F.3d at 1225, the alleged facts and circumstances on which the Amended Complaint here relies are too general to support the requisite *strong* inference with respect to the February disclosures.

The Amended Complaint is vague as to when the defendants became aware of facts that should have made them aware of the falseness of their optimistic statements, a circumstance found to weigh against a finding of a strong inference of scienter in In re Ariad Pharmaceuticals., Inc. Securities Litigation, 842 F.3d 744, 754 (1st Cir. 2016). The complaint alleges only that the defendants closely monitored Sonus's sales, "were regularly updated" on the discussions at sales meetings, and that the information from weekly sales meetings "was reported to [d]efendants." (See Am. Compl. ¶¶ 44(c), (d).)

The Amended Complaint also lacks details as to the degree by which sales forecasts were allegedly inflated, and thus the extent of any foreseeable shortfall. A vague assertion that defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter. See Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004). Just as in Orton, the plaintiff's narrative here, derived largely from unnamed former sales representatives and managers, is "spotty and vague." See id. at 307. The absence of key details "is indicative of the excessive generality of these allegations." Greebel, 194 F.3d at 204.

Furthermore, while proof of motive is not required to make out a claim under Section 10(b), courts often look to a defendant's possible motive for making a materially false or misleading representation in assessing allegations of scienter. See In re Cabletron Sys., Inc., 311 F.3d at 39.

The plaintiff has not alleged any of the telltale motives that have been found to strengthen an inference of scienter, such as insider stock sales or financial incentives far beyond the usual compensation packages. See Greebel, 194 F.3d at 196; Brennan v. Zafgen, Inc., 199 F. Supp. 3d 444, 468 (D. Mass. 2016) (noting further that typical "incentives to increase a company's earnings and stock price exist for almost every executive at every company, especially . . . technology companies" and thus fail to raise a strong inference of scienter). It is at least on the surface implausible, and thus inconsistent with a strong inference of scienter, to conclude that the defendants would intentionally make a revenue projection in February that they knew to be likely wrong, with the almost certain prospect of having to publicly correct the projection just a little over a month later. As the First Circuit noted in Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharmaceuticals., Inc., "several facts strongly suggest that [the defendant] had no motive to ignore an error that was obvious and that would therefore soon become known." 838 F.3d 76,

13

84 (1st Cir. 2016). Such conduct might be consistent with fingers-crossed wishful thinking, but that is quite a different mental state than the scienter required to support a cause of action for securities fraud.

Here, as in Vertex, it would clearly have been better for Sonus to announce a modified projection in February to prepare the market for the foreboding bad news rather than to stick with what was looming as an inflated projection, only to shortly thereafter have to confess not just error, but substantial error, thereby risking harm to "the company's credibility and its reputation for competence." Id.

That the defendants erred with respect to the Q1 2015 projection is clear. However, under the admonition against finding fraud by hindsight, general allegations "that defendants knew earlier what later turned out badly" are not sufficient to plead scienter. Ezra Charitable Tr., 466 F.3d at 6 (quoting Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)); see also Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) ("predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their burden of demonstrating intentional deception"). Without a strong inference of scienter, the plaintiff has not alleged an actionable Section 10(b) claim.[9]

C.     Section 20(a) Claims Against the Individual Defendants

Count II of the Amended Complaint alleges violations of Section 20(a) of the Exchange Act, which provides a cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the securities laws. See 15 U.S.C. § 78t(a). Where, as

---

[9] The defendants raise two additional grounds for dismissal not discussed herein: failure to plead loss causation and protection under the PSLRA's safe harbor. However, because the plaintiff has not adequately pled scienter, these grounds for dismissal need not be addressed.

here, the complaint fails to adequately plead an underlying violation of the securities laws, the Section 20(a) claims must also be dismissed. <u>Greebel</u>, 194 F.3d at 207.

      D.     <u>Leave to Amend</u>

      The plaintiff has requested, in a footnote on the final page of the opposition to the defendants' motion to dismiss, leave to amend the complaint "[i]n the event the Court is inclined to grant Defendants' Motion to Dismiss." (Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss 21 n.15 (dkt. no. 51).)

      The plaintiff has already been granted leave to amend once. The original Complaint was filed on April 6, 2015, the current lead plaintiff was appointed on June 5, 2015, and an Amended Complaint was filed on May 4, 2016. Accordingly, the plaintiff had approximately eleven months between the filing of the initial complaint and the Amended Complaint to thoroughly investigate the claims alleged. Furthermore, the plaintiff was put on notice of the deficiencies in the Amended Complaint by the motion to dismiss, but has made no suggestion that new information has been discovered such that amendment would not be futile.

      Under these circumstances, dismissal with prejudice is appropriate and the plaintiff's request to be allowed to replead is denied. <u>See</u> <u>ACA Fin.</u>, 512 F.3d at 57 (rejecting plaintiffs' argument that district court erred in denying leave to amend because "[p]laintiffs took no action to add new allegations" in response to defendants' motion to dismiss, and noting that allowing such a practice would "lead to delays, inefficiencies, and wasted work").

### III.     Conclusion

In light of the foregoing, the defendants' Motion to Dismiss (dkt. no. 48) is GRANTED.

This action is dismissed in its entirety.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge